IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 12, 2012

## STANLEY BLUE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-02312     Chris Craft, Judge**

_____

**No. W2011-01936-CCA-R3-PC  - Filed August 15, 2012**

_____

A Shelby County jury convicted the Petitioner, Stanley Blue, of facilitation of first degree murder, attempted second degree murder, and reckless endangerment.  The trial court sentenced him to an effective sentence of forty years.  The Petitioner did not appeal his sentence, but this Court affirmed his convictions on direct appeal.  *State v. Stanley Blue*, No. W2007-00292-CCA-R3-CD, 2009 WL 723845 (Tenn. Crim. App., at Jackson, Mar. 19, 2009), *perm. app. denied* (Tenn. Oct. 5, 2009).  The Petitioner then filed a petition for post-conviction relief, contending that he had received the ineffective assistance of counsel and that the sentence imposed by the trial court was illegal.  The post-conviction court granted the Petitioner's petition, in part, finding that his sentences were not constitutional.  The State appealed, contending that the post-conviction court erred when it granted the Petitioner a new sentencing hearing.  After a thorough review of the record and applicable authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Amy P. Weirich, District Attorney General, and Stephanie Johnson, Assistant District Attorney General for the appellant, State of Tennessee.

Patrick E. Stegall, Memphis, Tennessee, for the appellee, Stanley Blue.

## OPINION
### I. Facts

## A. Direct Appeal

This case arises from a shooting that occurred at Brown's Barbecue restaurant in Memphis, Tennessee. The Petitioner was first tried in relation to this shooting in April 2006, and that trial resulted in a mistrial. His second trial occurred in September 2006 and resulted in his convictions. In our opinion on the Petitioner's direct appeal of those convictions, we summarized some of the evidence against him as follows:

> The [Petitioner's] convictions arose from the March 11, 2003 slaying of Mareco Robinson and wounding of Jessie Lewis at a Memphis restaurant, Brown's Barbecue. Toya Sanders testified that she and Robinson were childhood friends. She recalled that she saw Robinson at a club, the Hard Luck Café, on the night of March 11, 2003, and that everyone there was "[h]aving a good time." She admitted that she had smoked some marijuana that night but said that she did not drink. She stated that the [Petitioner], whom she had known since childhood as "Puff," was also at the club that night. She saw the [Petitioner] and another male, whom she later learned through the course of the investigation was Eddie Partee, leaving the club in a Cadillac. After leaving the club at approximately 3:00 a.m., Sanders and her friends decided to go to Brown's Barbecue to get something to eat. When they arrived at Brown's Barbecue, the [Petitioner] and Partee were already at the restaurant. Soon after she and her friends arrived, Robinson arrived at the restaurant.

> Sanders testified that the [Petitioner] went out to his car while Partee waited in line for his order. She recalled that Robinson and Partee exchanged words about Robinson's order while waiting in line. Robinson went outside to his car and Partee followed him but went to the [Petitioner's] vehicle where Sanders witnessed Partee and the [Petitioner] talking. When Robinson returned to the restaurant, Partee and the [Petitioner] followed him. While the [Petitioner] went to the bathroom, Partee pulled a gun and shot Robinson in the back of the head. As soon as Partee shot Robinson, the [Petitioner] came out of the bathroom shooting "a little old bitty gun." Everyone fled the restaurant for safety. Sanders saw Partee and the [Petitioner] leave the restaurant, get into the Cadillac and flee the scene.

> Sanders testified that as everyone was leaving the restaurant, Jessie Lewis was walking in. She said that Partee and the [Petitioner] shot Lewis as he was entering the restaurant. She stated that as the men returned, she "was trying to get everybody out" because she could tell that something was about

-2-

to happen when the men went outside to the parking lot. Sanders testified that she never saw Robinson threaten or display a weapon to either the [Petitioner] or Partee, but she also admitted that she could not see whether Robinson retrieved anything from his car while he was outside listening to music with his hood up.

Jessie Lewis testified that he spoke with Robinson at Brown's Barbecue on the night of March 11, 2003. He recalled Robinson telling him that "something was wrong with [Partee]." Before Robinson could explain to Lewis what he meant, Partee entered the restaurant and shot him. Lewis had turned his back to Robinson but upon hearing the shot, he turned around and saw Partee standing over Robinson holding the gun. Lewis stated that the [Petitioner] walked from the bathroom and fired two more shots toward Robinson as he lay on the ground. Lewis recalled that everyone except him had left the restaurant with the firing of the first shot. He said that he was standing at the door "so shocked, [he] couldn't go nowhere [sic]" when the [Petitioner] came from the bathroom. The [Petitioner] and Partee walked to the front door and saw Lewis. The [Petitioner] then "bumped Partee in the back," and Partee "looked at [Lewis] and kicked the door open and shot [him]." Lewis was shot in the groin with the bullet exiting through his hip. He saw the [Petitioner] and Partee leave in the Cadillac with Partee driving. Lewis later identified the [Petitioner] as one of the individuals involved in the shooting. Lewis also stated that he did not see Robinson with a gun.

Kevia Taylor testified that she was with her cousin, Toya Sanders, at Brown's Barbecue on March 11, 2003. Her testimony was consistent with Sanders' testimony regarding the events leading up to the shooting. She witnessed Partee go to a vehicle, retrieve a pistol and load it before returning to the restaurant. She recalled that the [Petitioner] looked at Partee as they returned to the restaurant and she took that as a signal between the two men. Taylor stated that she "knew something was fixing to go down" so she started to leave the restaurant. As she was leaving, she heard the gunshots. She ran behind a building and did not see the [Petitioner] or Partee leave. Afterwards, she saw that Lewis had been shot as well as Robinson. Taylor later identified the [Petitioner] from a photographic lineup. Taylor admitted that she saw Robinson open the hood of his car and go to his trunk, but she could not see whether he got anything from the trunk before returning to the restaurant.

. . . .

Kcbena Cash of the Memphis Police Department testified that the [Petitioner] was developed as a suspect in the shootings within a week of the incident. After a warrant was issued for the [Petitioner's] arrest, Officer Cash began to look for the [Petitioner]. After Officer Cash talked to several family members and acquaintances of the [Petitioner], the [Petitioner] telephoned Officer Cash himself. She explained to the [Petitioner] that there was a warrant issued for him and asked him to come in voluntarily. She recalled that the [Petitioner] did not agree to turn himself in. As she continued her efforts to locate the [Petitioner], she spoke with the [Petitioner] daily on the telephone. She recalled that he always contacted her on private numbers. She testified that each time they talked "[t]he gist of the conversation was to turn himself in." Eventually, Officer Cash received a phone call or "tip" that led her to a possible location of the [Petitioner]. Upon arrival at the residence, the [Petitioner] was gone but a forty caliber handgun was discovered and taken into property at the Memphis Police Department. Eventually, Officer Cash received another tip regarding the [Petitioner's] whereabouts at a different residence and he was apprehended there while trying to escape from a window. Additionally, another handgun and forty caliber ammunition were found at the residence. On cross-examination, Officer Cash admitted that the [Petitioner] was not found at the first residence searched and that no one knew who left the forty caliber handgun at the residence.

Sergeant William D. Merritt of the Memphis Police Department testified that he acted as the case coordinator on the [Petitioner's] case. As part of his duties as the case coordinator, he sent items to the Tennessee Bureau of Investigation (TBI) for testing. Sergeant Merritt sent a Keltec forty caliber handgun, two forty caliber shell casings, one bullet projectile, and a Ruger nine millimeter semi-automatic to the TBI for analysis. Sergeant Merritt testified that the Ruger was recovered near a dumpster outside the restaurant. He further stated that his investigation revealed that Mario Broadnax had taken the Ruger from the victim and placed it near the dumpster.

TBI Special Agent Steve Scott testified as a firearms identification expert. After identifying the items submitted by Sergeant Merritt, Special Agent Scott determined that the spent cartridges and bullet recovered at the scene had been fired by the Keltec handgun. Testing of the Ruger pistol revealed that it would eject a shell casing much like the Keltec; however, no shell casings matching the Ruger were discovered at the scene. Special Agent Scott stated that the forty caliber bullet recovered from the victim's body was fired from a revolver-either a Smith and Wesson Special Revolver or a

Remington Magnum Revolver-and not a semi-automatic pistol like the Keltec or Ruger. The gun that fired the bullet recovered from the victim was not presented to the TBI for testing.

Dr. O'Brian Smith testified that he was the Shelby County Medical Examiner at the time of the shooting and that he performed the autopsy on the victim and determined that he suffered a gunshot wound to the right side of his head behind his ear that produced brain damage before the bullet came to rest in the front portion of the victim's brain. Toxicology testing of the victim's blood revealed a .203 grams percent blood alcohol content which Dr. Smith characterized as "moderately elevated." Toxicology testing revealed no presence of drugs. Dr. Smith testified that the cause of death was a gunshot wound to the head and opined that "in most instances, this bullet . . . wound would have a lethal outcome."

The State presented the prior sworn testimony of Mario Broadnax which was read to the jury by a court reporter. Broadnax testified that he had been at the Hard Luck Café on the night of the incident and that he had not been drinking that night, although he did admit to smoking one or two marijuana cigarettes earlier in the evening. He went to Brown's Barbecue after leaving the club and recalled seeing the victim there when he arrived. He could tell that the victim and some other men were arguing and he saw "one or two people" go inside the restaurant with guns. Broadnax testified that when he heard gunshots he ran to the back of the building. When he returned to the front of the parking lot, he discovered the surviving victim, Jessie Lewis, lying on the ground with a gunshot wound. He ran inside to check on the other victim, Mareco Robinson, who was still breathing. He told the employees to call the police.

Broadnax stated that another witness indicated to him that the victim had a weapon so he returned to the victim, removed the gun from the victim's belt, and hid it behind the restaurant. Other witnesses told the police that Broadnax removed the gun so, several days later, he led the police to the location of the gun. He explained that he removed the gun because he "felt that if [the police] came and found a gun on [the victim], you know, that they probably wouldn't, you know, try to find out who did it." Broadnax identified the [Petitioner] as one of the people he saw at the restaurant that night. He also stated that he removed the gun from underneath the victim's shirt. He admitted on cross-examination that he could not see who fired the shots because he ran behind the building when the shooting began. After the reading of Broadnax's

-5-

testimony, the State rested its case-in-chief.

The [Petitioner] presented the testimony of Daryl Powell, who stated that he was at Brown's Barbecue on the night of the shooting. He recalled that he was there sleeping but that he "wasn't supposed to be" there. He said that he was asleep in a booth when the argument between the victim and the other men woke him up. He said that he knew the victim by his neighborhood nickname of "C-Murder." He saw the victim go to his car and return to the restaurant with a black gun in his hand. He testified that everyone in the restaurant "just went hysterical" and the shooting began. He did not know the man who shot the victim. He reiterated that he saw a gun in the victim's hand when the shooting occurred. He testified that when one person shot the victim he just dropped and then another individual began shooting as well. He saw the two shooters leave the scene in a Cadillac. On cross-examination, Powell was confronted with his statement to police that failed to mention the presence of the victim's gun. He explained that maybe the police did not write that down and that he did not want "to be in everybody else's business" but that he definitely saw the victim with a gun.

Calandra Shaw testified that she was working at Brown's Barbecue on the night of the shooting. She had worked at the restaurant for about fifteen years and knew the victim, "Reco," as a regular customer. She recalled that Reco and another man argued at the front counter for about ten minutes. She recalled that the other man left the restaurant and, about ten minutes later, she heard shooting. Shaw testified that she crawled to lock the door so no one else would come inside during the shooting. She stated that she heard a quick series of gunshots. When the shooting ended, she stood up to see the victim fall to the floor. She saw a man in a yellow shirt remove a gun from the victim's pocket. On cross-examination, she stated that she did not see the victim get shot, but she did see him fall to the ground after being shot.

Memphis Police Department Officer Danny James testified that he worked as a crime scene officer at the time of the shooting. He stated that he photographed the location of a gun found on the steps outside the restaurant.

*Blue*, 2009 WL 723845 , at *1-5 (footnote omitted). Based upon this evidence, the jury convicted the Petitioner of facilitation of first degree murder, attempted second degree murder, and reckless endangerment. The trial court sentenced the Petitioner to thirty-four years, as a Range II offender, for the facilitation of first degree murder conviction and to fifteen years, as a Range II offender, for the attempted second degree murder conviction. The

trial court then sentenced the Petitioner as a Range III offender to six years for the reckless endangerment conviction. The trial court ordered that the thirty-four-year and fifteen-year sentences run concurrently but that the six-year sentence run consecutively to the other two sentences, for a total effective sentence of forty years.

## B. Post-Conviction Facts

The Petitioner filed a pro se petition for post-conviction relief in which he alleged, among other things, that he had received the ineffective assistance of counsel and that the trial court had imposed an illegal sentence upon him. The post-conviction court appointed an attorney to represent the Petitioner, and the attorney filed an amended petition. The amended petition added a claim that the Petitioner's trial counsel was ineffective for failing to challenge the imposition of consecutive sentences on appeal. At a hearing on the Petitioner's petition, the parties presented the following evidence: Counsel testified that another attorney, Co-Counsel, was appointed to represent the Petitioner. The State then filed a notice of its intent to seek the death penalty, and Counsel was appointed shortly thereafter to act as the second chair attorney.

Counsel recounted that there were two trials in the Petitioner's case. During the first, near the close of the State's proof, the State informed the trial court that it could not locate one of their witnesses. The State sought to introduce the witness's testimony from a suppression hearing, and, after the trial court denied this request, the defense moved for a mistrial. The State did not object, and the trial court granted the mistrial. After the mistrial, and before the second trial, the State withdrew its notice to seek the death penalty.

Counsel testified that at the second trial the Petitioner was tried on the same charges, including first degree murder, and he was convicted of the lesser-included offense of facilitation of first degree murder. Counsel testified that there was no proof presented at trial that the Petitioner shot the victim. He recalled that one of the witnesses testified that he saw the Petitioner stand over the victim and fire two shots, but there was absolutely no other evidence that the Petitioner shot at the victim. Counsel testified that the Petitioner's co-defendant, the man who shot the victim, was allowed to plead guilty to voluntary manslaughter and received a sentence of fifteen years. Counsel described this occurrence as "outrageous."

Counsel recalled that he prepared for the case by hiring an investigator, who tracked down numerous witnesses. Counsel said the defense team filed numerous motions and attended numerous evidentiary hearings. Counsel went to Brown's Barbeque to investigate the location, and he spoke to the owner who had not seen anything of relevance. Counsel said he spent "pretty much two years of my life working on this case." Counsel recalled how both

he and the investigator spoke with the Petitioner on numerous occasions.

Counsel testified that both he and Co-Counsel represented the Petitioner at the sentencing hearing. Counsel said, however, he alone represented the Petitioner on appeal. Counsel conceded that he did not raise the issue of sentencing on appeal, explaining that his appeal focused on the fact that the trial court had excluded psychological testimony that Counsel firmly believed should have been admitted. He said that, in hindsight, he should have raised the consecutive sentencing issue on appeal. He recalled that, at the time, he was also representing the Petitioner in a federal case.

During cross-examination, Counsel testified that the State had offered to agree to the letting the Petitioner plead guilty to facilitation of first degree murder with a thirty-year sentence, to be served at 30%. The Petitioner declined that offer. Counsel said that, after the first mistrial, the State offered twenty-five years, to be served at 30%, and the Petitioner also declined that offer. On the day the trial began, the federal court faxed to Counsel's office an indictment charging the Petitioner with being a felon in the possession of a handgun. After this, the Petitioner attempted to enter a guilty plea to both the state and federal charges in exchange for a sentence of twenty-five years, to be served at 30%. Counsel said that the Petitioner took the stand to enter the guilty plea and then the prosecutor indicated that he was withdrawing his offer. According to Counsel, the guilty plea "fell apart," and the parties proceeded to trial.

Counsel testified that it was undisputed that the Petitioner never shot the victim, and this was his theory of defense. Counsel said he told the jury during opening statements that the Petitioner came out of the bathroom shooting into the air because he was trying to get out of the restaurant and that he had no intent to shoot anyone. Counsel said that no one disputed this assertion. Counsel said that they called witnesses on the Petitioner's behalf who testified that "everybody" in the restaurant had a gun, not just the Petitioner.

Counsel testified that he was present at sentencing and agreed that the trial court offered sufficient grounds upon which to base sentencing the Petitioner to consecutive sentences. He said, however, that he felt the trial court's sentence was too lengthy . Counsel conceded that he managed to get the federal sentence to run concurrently with the state sentence. He also conceded that the Petitioner was classified as an "arm career criminal" meaning that he had been convicted of being a felon in the possession of a firearm who had previously been convicted of three or more violent felonies. According to the suggested federal guidelines, the Petitioner's minimum sentence had to be 360 months, without any percentage on parole. Counsel, however, successfully got the Petitioner's sentence reduced to 240 months, to run concurrently with his state sentence.

On redirect examination, Counsel testified that the witness who had said that the victim had a gun did not testify at the Petitioner's second trial because they could not locate him.

The Petitioner took the stand and told the post-conviction court that there were several witnesses, Don Bonner, Lewis Brown, and Christopher Butts, who had attempted unsuccessfully to call the Petitioner's trial attorney. The Petitioner testified that those witnesses would have testified that the victim came into the restaurant from the parking lot threatening to kill the Petitioner or his co-defendant. This, he said, would show that Counsel was ineffective for not arguing his "case as a manslaughter case."

The Petitioner testified that Counsel was ineffective for failing to contest the trial court's application of enhancement factors during his sentencing. He further contended that he told Counsel that his sentences should not have been ordered to run consecutively. Counsel, however, never presented this as an issue on appeal.

The Petitioner also testified that he and Counsel had an "actual conflict" because Counsel expressed his desire not to call the Petitioner's co-defendant as a witness. The Petitioner said Counsel should have called this witness in order to adequately present a defense of manslaughter.

The Petitioner said Counsel failed to have his statement to police suppressed. The Petitioner recalled that police investigators obtained pictures of his children and told him that they would let him see his children if he gave a statement to them about the incident. The Petitioner conceded that Counsel brought this fact up to the trial judge, but the Petitioner did not know the outcome of the hearing on this matter.

During cross-examination, the Petitioner clarified that he thought Counsel was ineffective for allowing the trial court to use enhancement factors in addition to his prior criminal history. In addition, he contended that Counsel should have raised on appeal the fact that he was improperly sentenced to consecutive sentences.

The Petitioner testified that he wanted Counsel to argue "manslaughter" because the victim made him act in an "irrational manner." He wanted the witnesses he named to be called to show that he "shot out of fear."

The post-conviction hearing was then continued to a later date so that the witnesses named by the Petitioner could be subpoenaed. At the subsequent hearing, the Petitioner testified that if Lewis Brown were called to testify at the hearing, he would testify that the victim came out to the car yelling, talking about killing someone. The Petitioner said that he learned about Brown before his trial and that he told his attorneys about him but that they

never called Brown.

Lewis Brown testified that he was at Brown's Barbecue on March 11, 2003. He said that, as he was arriving, "a guy burst out the door real angry talking about murdering somebody." The man said "I'm fixing to kill this motherfucker." Brown said he watched the man go to his car, pull out a gun from the front seat, and then re-enter the restaurant. Within a few minutes, Brown heard gun fire, and he said he could not estimate how many shots he heard. He said he never went inside the restaurant because, as soon as he heard the man say he was going to kill someone, Brown turned and walked in the opposite direction of the restaurant.

During cross-examination, Brown testified that he told his girlfriend, Ann, about what he had seen at the restaurant. He said he did not know that someone had been killed in the shooting. He said that he moved to Nashville and did not hear anything else about the shooting until he recently got "back into town" in March 2010. He said in June 2010 he heard two young ladies talking on a bus about someone named "C Murder" being killed at Brown's Barbecue. Brown said he told the ladies that he was present at the scene of the murder. The ladies asked for his name and telephone number. They later called him and asked him to contact the Petitioner's lawyer.

The State then called Co-Counsel in rebuttal, and he testified that he was appointed to represent the Petitioner during both of his trials on these charges. Co-Counsel testified that the defense theory was that the co-defendant, Partee, had killed the victim and that the Petitioner was not criminally responsible for Partee's actions. The proof at trial was that Partee was the gunman who walked up to and shot the victim in the back of the head. The Petitioner, who was in possession of a gun, was at or near a bathroom inside the restaurant at the time. The Petitioner shot into the air. Co-Counsel testified they never considered presenting a theory of defense based upon voluntary manslaughter because the goal was to separate the Petitioner from the crime that Partee had committed. Co-Counsel said that they discussed their strategy with the Petitioner "many times."

Co-Counsel testified that he was unaware of any witness that the Petitioner wanted to call that the defense team did not call. He said that the defense team hired investigators who interviewed multiple people who may have had information about the shooting. He said the investigators were "very thorough." Co-Counsel said that, had the Petitioner given them the name of a witness, they would have had the investigators attempt to find that individual.

Co-Counsel said that he and Counsel discussed with the Petitioner the possibility of consecutive sentencing with the Petitioner before trial. He said that, before trial, the State had offered the Petitioner a twenty-five year sentence, to be served at 30%, in exchange for his

guilty plea. Co-Counsel said he informed the Petitioner that if the jury believed the State's theory then the trial court could order consecutive sentencing. Co-Counsel recalled that the Petitioner's criminal history included a conviction for attempted second degree murder. Further, while this case was pending, the Petitioner was indicted on federal charges of being a felon in the possession of a handgun.

Based upon this evidence, the post-conviction court granted in part, and denied in part, the Petitioner's petition for post-conviction relief. The post-conviction court issued a written order, in which it found that the Petitioner's trial counsel were not ineffective during the trial. The post-conviction court determined the Petitioner was not entitled to post-conviction relief from his convictions. The post-conviction court granted the Petitioner post-conviction relief with regard to his sentence, finding:

## *Gomez* SENTENCING ISSUE

The offense for which the [P]etitioner was convicted and sentenced was committed on March 11, 2003. He was sentenced on November 21, 2006, and during that hearing the trial judge found the following five enhancement factors: 1) that the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, 2) that the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense, 3) that the defendant had no hesitation about committing a crime when the risk to human life was high (due to the presence of other persons in the restaurant at the time the shots were fired), 4) that the crime was committed under circumstances under which the potential for bodily injury to a victim was great (although either not considering that factor or giving it no weight as it was an element of the offense), and 5) that the defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult.

In *State v. Gomez*, 239 S.W.3d 733, 740 (Tenn. 2007), decided after the sentencing hearing in this case, our Tennessee Supreme Court held that an imposition of a greater sentence based upon factual determinations made by the trial judge rather than a jury violates the Sixth Amendment. Based upon this holding in *Gomez*, only the first enhancement factor regarding the [P]etitioner's prior convictions should have been applied. In fairness to the trial judge and the trial attorneys, this was not the law at the time of sentencing in the [P]etitioner's case. It is now well established in our case law that the pre-2005 Sentencing Act under which the [P]etitioner was sentenced is unconstitutional

-11-

as violative of a defendant's constitutional right to a jury trial, but at the time of sentencing our Supreme Court had held that *Blakely* did not apply to Tennessee's sentencing scheme.

Although this court finds that the factor of his prior record alone is such that his 40 year sentence could well be justified, this court cannot find with any certainty that the [P]etitioner's sentence would have been the same if the trial judge had only considered the one applicable factor. The trial court stated during sentencing that it was putting emphasis on "the fact that he had armed himself with a firearm in the commission of an offense: in addition to his prior record." The court also took into consideration an aggravated robbery adjudication in juvenile court, for which the [P]etitioner was sent to the Youth Services Bureau, and gave it "some weight." Prior juvenile adjudications may withstand *Blakely* scrutiny only if the defendant unequivocally admits at trial or at the sentencing hearing to the commission of an offense [t]hat would be a felony if committed as an adult. The trial judge also mentioned several times the danger to the others in the restaurant, even thought not stating the weight he had given that factor. Had the trial attorneys appealed the [P]etitioner's sentence, the trial judge's sentence would not have been entitled to the presumption of correctness under the pre-2005 sentencing laws, and the [P]etitioner's present sentences would most likely have been remanded to the trial court for resentencing. Therefore this court finds that the cause should be remanded to the trial court for a new sentencing hearing.

(some citations omitted). It is from this judgment that the State now appeals.

## II. Analysis

On appeal, the State contends the post-conviction court erred when it granted the Petitioner post-conviction relief from his sentencing. The State asserts that the Petitioner has waived the enhancement factor issue by not presenting it on direct appeal and that the holdings in the cases upon which the post-conviction court relied, *Gomez II* and *Cunningham*, are not retroactively applicable to cases on collateral review.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude

that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the

questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (internal quotations omitted).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

Before we begin our analysis, we briefly summarize the relevant dates involved in this case. The Petitioner's crimes occurred on March 11, 2003. His trial occurred in September 2006, and the trial court sentenced him on November 21, 2006. The Petitioner's direct appeal was heard by this Court on June 3, 2008, and we issued our opinion on his appeal on March 19, 2009.

The Petitioner claims, and the trial court granted the Petitioner post-conviction relief because it agreed, that Counsel was ineffective because he failed to object to the trial court's application of enhancement factors that had not been factually determined by a jury nor did counsel raise the issue on appeal. At the time of the Petitioner's sentencing, the Tennessee Supreme Court's opinion in *State v. Gomez* (*Gomez I*), 163 S.W.3d 632 (Tenn. 2005), which held that Tennessee's sentencing statutes were in line with the Sixth Amendment of the federal constitution, was still good law. *Gomez I*, 163 S.W.3d at 661. It was not until October 2007 that the Tennessee Supreme Court ruled that "to the extent the Reform Act permitted enhancement based on judicially determined facts other than the fact of a prior

conviction, it violated the Sixth Amendment as interpreted by the Supreme Court in *Apprendi*, *Blakely*, and *Cunningham*." *State v. Gomez* (*Gomez II*), 239 S.W.3d 733, 740 (Tenn. 2007) (citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Blakely v. Washington*, 542 U.S. 296 (2004); *Cunningham v. California*, 549 U.S. 270 (2007)).

We note that *Gomez II* was released October 9, 2007, eight months before the Petitioner's direct appeal was docketed in this Court and seventeen months before this Court issued its opinion. Counsel could have, and should have, filed a motion in this Court to add the *Gomez II* issue to the Petitioner's appeal, even if our review was limited to plain error because the issue was not presented in the lower court. Around the same time frame as the Petitioner's direct appeal, this Court remanded multiple cases for resentencing based upon the *Gomez II*, *Blakely*, and *Apprendi* line of cases. *See e.g., State v. Mark Anthony Foulk*, No. E2007-00944-CCA-R3-CD, 2009 WL 47346, at *14-15 (Tenn. Crim. App., at Knoxville, Jan. 8, 2009), *perm. app. denied* (Tenn. May 26, 2009). Some of those cases were based on a plain error review. *See e.g., State v. Allen Doane*, No. E2008-00125-CCA-R3-CD, 2009 WL 21032, at *1 (Tenn. Crim. App., at Knoxville, Jan. 5, 2009), *no Tenn. R. App. P. 11 application filed*. We conclude that Counsel was ineffective by failing to take measures to ensure that the Petitioner's sentences were reviewed, and we agree with the post-conviction court that the Petitioner is entitled to a new sentencing hearing.

The State notes that, even if the record does establish a *Gomez II* violation, the Petitioner is raising this argument for the first time on collateral review. It notes that this Court has repeatedly held that *Blakely*, *Cunningham*, and *Gomez II* did not establish a new rule of constitutional law which was entitled to retroactive application on collateral review as it was only a clarification of the rule announced in *Apprendi*, 530 U.S. 466. The State relies upon *Billy Merle Meeks v. State*, No. M2005-006260CCA-R3-HC, 2007 WL 4116486 (Tenn. Crim. App., at Nashville, Nov. 13, 2007); *Glen Cook v. State*, No. W2006-01514-CCA-R3-PC, 2008 WL 821532, at *10 (Tenn. Crim. App., at Jackson, Mar. 27, 2008); and *Carl Johnson v. State*, No. W2003-02760-CCA-R3-PC, 2005 WL 181699, at *4 (Tenn. Crim. App., at Jackson, Jan. 25, 2005) in support of its argument. We respectfully reject the State's position, in part, because we conclude that the cases cited by the State are distinguishable from this case. First, we agree that this issue is not one that is properly raised in a habeas corpus petition, as it was in *Meeks*. In this case, however, the Petitioner is asserting that Counsel was ineffective for failing to raise the sentencing issue in his direct appeal. He is not seeking habeas corpus relief based upon his sentence. Further, in the other cases cited by the State, the petitioner raised as an issue in his post-conviction petition, or a supplement thereto, that his sentence violated *Gomez II*. This Court, in those cases, rejected the Petitioner's argument based upon the fact that this Court "ha[d] previously held that *Blakely* does not apply retroactively to cases on collateral appeal." *Cook*, 2008 WL 821532, at *10. In the case presently before us, the Petitioner is clearly arguing that Counsel should have

raised the issue of his sentence on his direct appeal, as it was heard and issued well after *Gomez II.* The Petitioner is not collaterally attacking his sentence; rather, he is arguing that his trial counsel was ineffective for failing to raise the issue of his sentence on appeal. Accordingly, we agree with the post-conviction court that the Petitioner is entitled to post-conviction relief from his sentence, and we affirm the post-conviction court's judgment.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we conclude that the post-conviction court properly ordered a new sentencing hearing. The post-conviction court's judgment is, therefore, affirmed, and the case is remanded for a new sentencing hearing.

_____
ROBERT W. WEDEMEYER, JUDGE